of the year 2015. We hope to come back often, Judge Smith. The appeal today, of course, arises from Mr. Ortiz. I hope so, Judge. I have another one on Thursday, so I'm going to spend all day tomorrow preparing. But I need to win this one first before I can get to that one. First things first. Of course, today, Your Honors, we appeal from the conditional plea preserving Mr. Ortiz's suppression of the denial of his motion to suppress. This motion was, of course, bifurcated. We first moved to suppress the entire seizure of the guns on the argument that there was no reasonable suspicion elicited by Mr. Hernandez's statement to the ATF and then the secondary and tertiary agents who received that information who later effected the stop. And then that's, of course, our most blunt argument. More incisive, of course, is our argument that the statement that Agent Milligan wrote out, which was reproduced in my brief, should be suppressed because it was a custodial statement under all the Mendenhall-Royer factors, and there was no doubt that Mr. Ortiz was not Mirandized. The first statement is good, and the second one is not. Where are we? I'm sorry. Say again, Judge. What if the first statement is good and the second one is not? That is, the first one suppressed was well taken as to the first, but not as to the second. Where are we then in the case? Yes, Your Honor. Under any of those multiple possible outcome situations, under any of those, you should still reverse for proceedings down the district court without benefit of the evidence that should have been properly suppressed. And this is not just a mere academic matter. An academic point on my part, Judge Higginbotham, that very much makes sense from a point of trial strategy. For instance, if we were to lose that the gun should not have been suppressed, we still have the government could proceed with evidence of these guns and the statements on the form, 3347s, and yet, Judge, if we did not have, if the motion to suppress had been granted as to the written statement, then I would be in a trial situation. All I would have is a client, a former member of the U.S. Army, who exercised his God-given right as a Texan to go buy a gun. The government could proceed to trial if they wanted to in that situation. It's not just a gun. You're right. There's two legally purchased guns, a non-prohibited person with no criminal history whatsoever, even the fellow who was with him, the fellow who later skipped bond. They've never found him. He was a legal resident alien. That guy was also himself not a prohibited person. They were very powerful assault rifles, Your Honor, that are legally sold. I'm just engaging you on where we really are in this case about someone just going in and not just buying a handgun or hunting weapon. The evidence is also there that he didn't want sight, et cetera. He paid cash. He left to use a card when he could use a credit card. All that evidence is there. I'm just trying to understand in the real world where we really are in this. Please allow me to respond to them in Siriatim. I myself, Judge Higginbotham, am not a gun person. I learned quite a bit about guns in preparation for the suppression hearing. The first thing I learned, of course, is that this gun is particularly popular. Mr. Hernandez testified it was so popular, in fact, that they only had one additional gun in stock. He also testified that the vast majority, over 1,000 customers, have come in the last year and purchased guns of this type. In 2010, there was a lot of talk about the government coming to get your gun, that sort of thing. Be that it may, that these guns are powerful, Judge. They are perfectly legal in our country to purchase. Moreover, Your Honor, I asked Mr. Hernandez very specifically, what percentage of your customers pay in cash? He said about half. I don't know if it's just more or just less. I said, how many of your customers buy more than one gun? The vast majority of them. I asked Mr. Hernandez. He, of course, I think in my brief I called it preposterous. I don't mean to impugn his integrity any, but the idea that there's something suspicious that you would choose to buy a firearm without sights or scopes when those are interchangeable parts. I even went on their website, and he disagreed with me, although I had the pages from his store's website in my hand, that they sell all manner of sights and scopes. Judge, going from $50 to several thousand, he agreed with me. Anybody who was good with guns, like somebody like Mr. Ortiz who had served in the United States Army, could easily put a sight or a scope from one to the other. On the issue, Your Honor, of the fact that Mr. Ortiz did not pay it in cash for the first gun, then left for all of 15 minutes, Judge, while he went to get cash for the second one, leaving on the shelf the gun he had just paid in cash for, not suspicious, not somebody who's about to take off, pretty clear he's coming back. Judge, he could not have, and I was very clear with Mr. Hernandez on this in the hearing. We went back and forth, and he finally agreed with me. He may well have had a debit credit card machine in his store. The problem is those cards have point-of-sale transactions. My card is set the same way. I could not use my debit card if I went in there today to make that large of a purchase. He had to go to get the cash. There is nothing remotely, I'm going to say suspicious, nothing that rises to the level of reasonable suspicion on the part that was conveyed to the agent. Even if, Judge Higginbotham, I were wrong about or if you disagree with me on a couple of those facts, you then have the other issue. I'll just skip ahead a little bit. This is kind of my Ventresca-Whitley fellow officer rule. The fact is that neither Agent Milligan or Pham were contacted by the store. The sequence here is very important. Mr. Hernandez called Special Agent Tommy Gray. I don't know where he was. He was somewhere that he could not get anywhere near the store, SOG Armory, any time. He then turned around and called Agent Vu Pham. Agent Vu Pham then told Mr. Milligan, who was the only agent that the government put on at the hearing, there's a straw by here. It's our position, Your Honor, that reasonable suspicion requires the articulation to the arresting officer of facts, not a conclusion. You just can't say there's a straw by. Even if I'm wrong that none of the facts Mr. Hernandez testified to suggested a straw by, they didn't have any of those facts when they went and confected the ultimate seizure later on at the Shell Station. I want to, of course, use my time, Your Honors, most judiciously. If you have more questions about the instance of the probable cause of Mr. Hernandez' statement, I'll bear down on that. If not, I'd like to move on. Even if I'm wrong on that, like I said to Agent Mothman, I would love to try a case where the only thing the government is proving has evidence that my client, a non-prohibited person, went and made a legal purchase of a gun. I would think that would be a fun case to try to a jury in Houston, Texas. So then we go to how it is that the parties left the SOG armory and proceeded 11 miles down the Beltway 8 to Highway 6 to this Shell Station. I'll be honest with you, Your Honors, when I was at the suppression hearing and I heard Agent Mulligan start talking about heat runs, I thought perhaps I had stepped into the wrong courtroom because I had been reading his grand jury testimony for months. I didn't ever hear a word about this. The court reporter said control V, pasting. That's all he ever said every time we asked him about it. I said, all right, heat runs that you haven't told me about in the grand jury before your reports. Let me be clear. Was he driving really erratically? Oh, yes. Driving like this? Of course, you can't see that I was making that hand motion on the record. He's like, oh, yes. Through residential neighborhoods, right. And he didn't hit any cars on the street. What streets was he driving on? The agent said, I don't know. What neighborhoods are there? I'm not sure, you know, kind of can't remember. How is it, I know it's a controversial finding by a district judge on a suppression hearing but there is still the standard of clear error like we have in sufficiency analyses where you look at something that defies physical laws. It's our contention, your honors, it is impossible in the middle of the day to drive for an hour weaving and bobbing all around residential neighborhoods without hitting anybody there. And how do we know this? I know this because these two agents and Agent Mulligan was very clear on his direct examination by Agent Cousin. One of the first questions he asked him, did you ever lose sight of that car between the time he left SOG and the time he went to that shell station? His answer was no. Your honors, they never pulled these guys, Mr. Ortiz over while he was in this hour of this danger to the traveling public as he was driving. They waited until he was actually already at the shell station. Let me be clear, your honors. I think the exhibits here probably tell a thousand words. We'd ask you to look at exhibits eight, nine and six. Look at this enormous area of frontage in between the gas pumps and the highway six. If this Mr. Ortiz was trying to engage in yet another heat run, an evasive maneuver to flush out the law enforcement that was, you know, trying to follow him, why on earth would you pull directly up to a gas pump? That's the exact opposite of what you would want to do. And Agent Mulligan's testimony here, your honors, is 180 degrees inconsistent. If you look at the first two or three pages of his direct examination by Mr. Cousin, the first thing he said was, oh, well, you know, I wasn't sure that Mr. Ortiz was parked close enough to the pump to get out and get gas. But then he conceded to Mr. Cousin, probably didn't mean to ask him this question, that he had, Mr. Mulligan had been held up in traffic. It was Agent Vu Pham who had already approached on the passenger side with his gun drawn. So it is impossible. Agent Mulligan could not have seen Mr. Ortiz fail to get out of the car to get gas if he himself did not arrive on the scene in time for some other agent had already come up to the vehicle with his gun drawn. It's physically impossible. It cannot have happened. That was the first thing that happened at the Shell Station, your honor. Then, pretty quickly here, it's amazing, if you look at the Mendenhall-Royer factors, you can check off almost every single one in this case, the large number of agents, the guns drawn on the vehicle when they first got out of the car. I think probably critical here is the fact that Mr. Ortiz was not Mirandized, yet Mr. Diaz was Mirandized. What do you do with the fact that the agents twice told him he was not under arrest? Well, yes, your honor. The course of the standard is whether or not a reasonable person under the objective test would think they were free to leave. If it was just a purely talismanic, you know, you're not under arrest, but here we are with numerous people with guns around you, and there's many cases like that. Just last year, Judge Juneau was affirmed by this course in a case where the agent said you're not under arrest, and yet they monitored this fellow's phone calls, they watched where he went, they told him where he could go to the bathroom. Judge Smith, the agents produced food that they made Mr. Ortiz eat in their presence after they let him out of the car. Judge Smith, how can you, when you have the large number of agents, the guns drawn, then you have this repeated cuffing, uncuffing, recuffing, frisking of Mr. Ortiz? And Agent Milligan was even clear on this, Judge Smith, in response to questions by Mr. Ortiz, cuff him, frisk him, but Agent Smith did not have the authority to have him be uncuffed. So after they knew, Judge Smith, that he had nothing on his contraband, as evidenced by the two frisks that showed he had nothing dangerous on him, sharp objects or anything like that, even then he still stayed in cuffs. And Judge Lake was like, how long was he in cuffs total? And Milligan said somewhere, after I don't recall, of course, he said somewhere between five to ten minutes. So he had to stand there, Judge Smith, like this. This is July in Houston. It's really hot. Out there at this gas station, cuffed for several minutes after they knew he had nothing. After they uncuffed him, they went over and got in a car. They did. And that's why I assume they did that. They did get in a car and the agent... They saw him. Yes. They got out of the heat and into an air-conditioned car and said, let's get in the car. I thought that's what happened. Sure, that's correct. Yes, they got into the car and the car was air-conditioned. It's very hot in Houston. It was a 45-minute judge with Agent Biasteros in the front seat, Agent Milligan in the back, that Agent Milligan wrote out the statement that Mr. Ortiz signed. Of course, it's reproduced in the brief. So I think the question you asked me at the very beginning, Judge, even if you found the original statement, yes, I bought this gun, after the point at which Judge Smith said the agent testified, you're not under arrest, even though we have all these guns pointing at you, it was once they were put into the car, Your Honor, that Agent Milligan wrote out that statement. If nothing else, if you rejected my arguments in the first and second... The price of this .50 caliber. $2,100. So you have a person that comes in and wants to buy for his personal use. A .50 caliber gun, I think it was a semi-automatic, wasn't automatic. Right. And the only place in that particular weapon that you can buy ammunition, period, is in that store, right? That's right. And then he's going to buy a sight. How many more of these do you have, right? Right. And he said, well, no, and then he's undertaken, in essence, to make a $4,400 cash purchase of two .50 caliber weapons, unsighted. And what about the ammunition? That's right. He only bought one box of the ammunition, although Mr. Hernandez agreed with me that if you know how to boresight a gun, you would not need more than one box of such ammunition. A .50 caliber weapon, a box, what is that, five or ten shells? That's not in the record. I don't know the answer to that. I don't know myself, and I'd be outside the record if we didn't talk about the number of bullets in a box. I apologize. I don't know the answer either. I'm trying to get the sense of this, because the person who's selling it, the people who are selling the weapon and the profit by that, suspected that it was a straw purchase. And they're the ones that brought the police in. That circumstance, is that a relevant circumstance in determining the reasonableness of this? Well, it certainly would be reasonable, Your Honor, as to why those agents went there. I understand the standard for citizen informant, Adams v. Williams, Alabama v. White. This is not a confidential anonymous informant. I understand all that. My problem is once we get judged, the critical evidence that needed to be suppressed in order for Mr. Ortiz to go to trial was that written statement, which, of course, is 5 degrees and an hour and a half, maybe an hour and 45 minutes, after Mr. Hernandez. And you put Mr. Hernandez to the side, Judge, we still have this very problematic, non-merandized custodial interrogation that an agent wrote out for him after numerous friskings, guns pointing, even separated from his friend. I see my time is up. How do we know that this was a custodial interrogation, Your Honor? Because they merandized the other fellow who was sitting immediately next to him. They knew it was custodial there. They knew it was custodial here. That's why, at the minimum, that written statement should be suppressed, and that is not an indentualist or academic argument. That is a very triable case for me to go down there without that written statement. All right. You've saved time, Mr. Butler. Thank you. Thank you. Kaluri? Kaluri, yes. May it please the Court, Anna Kaluri on behalf of the United States. I think the first thing that I'd like to do, if it's all right with the panel, is to clarify some of the facts relayed by my brother. I think the first thing is that all four factors identified by Mr. Hernandez were specifically relayed to the two agents, to Agent Phan and Milligan, and that's on record page 301. The prosecutor specifically went back on redirect and said all four were relayed to you. You were aware of these, and he said yes. And we also, after we heard of them, thought they were suspicious as well. So this isn't a case where it's simply a phone call from Mr. Hernandez to another agent, saying, hey, we have reasonable suspicion, go get these guys. There was actual articulable facts related to the agents, so I think that's an important clarification. Going next to this idea of heat runs and whether or not it was in the reports and in the testimony, the agent admitted that he did not use the term heat runs in his testimony or in his reports. However, he did describe the driving. He described it as several dangerous lane changes, several U-turns. He went into neighborhoods, and then he admitted at the hearing that this was consistent with heat runs. I don't believe that there's anything. He was questioned extensively by counsel about that in terms of it being in his reports or in the grand jury testimony as well. Moving to the Shell station and what actually occurred there, there were five agents there, I'm sorry, six agents there and five vehicles. However, the large number of vehicles, there were two. There was Mr. Ortiz and Mr. Diaz-Meza. Each had agents who were speaking with them. With Mr. Ortiz, it was only Agent Milligan and Agent Phan in the beginning and then Agent Balestros when he was writing the statement. So at any time, there was only two agents actually with Mr. Ortiz. Well, counsel, in your briefing, you focus, I want to use the word solely, at least primarily, I think solely you focus on the suppression of the first statement, not the statement that was made in the car. What's your position about the statement that was made in the car? There was no custodial interrogation. There was no need for Miranda warnings. After the initial statement was made, yes, he was handcuffed once. He was questioned in the back seat of a car. He was not questioned in the back. Well, I assume that there were some questions. The record is absent as to exactly. Two agents were in the car. Two agents in the car. There was one agent up front with him and there was one agent in the back. The agent in the back is the one who recorded the statement. Up to seven agents were outside the car. I believe, no, there were a total of six agents at the gas station, so two were in the car, four were outside, presumably dealing with the other individual who was there. All right. Well, six cars? No, I believe there were six agents and five cars. Yes, six agents and five cars. I believe that was the testimony there. All right. He had been handcuffed for several minutes. He had been handcuffed once, not multiple times. After Agent Smith came over, asked if he had been pat frisked, Agent Milligan said no. He was then told we are going to handcuff you as we frisk you for any sort of weapons or anything else. He was handcuffed. Right now I'm focusing on in the car. Agents had taken his keys, according to him, when he was in the car. At that point it's unclear. The record of the motion to suppress is unclear when the keys were actually either handed over or taken from Mr. Ortiz. We do know that when he was given them back, we do know that at the end of after the statement was given, that Agent Milligan received it from another agent because he was able to go into the car and retrieve the two rifles. The record is. But your position is that a reasonable person would have felt free to leave that car at that time? Yes. During the course of that questioning. Yes. At this point a reasonable person would have felt he was free to leave. He made a statement. A little bit about that. The man has been not just boxed in or not boxed in. These cars are around him. But he has been confronted by officers with drawn weapons. They drew their weapons and they handcuffed him. I don't know. These are themselves very powerful suggestions that a reasonable person would conclude he's not free to go because they took the cuffs off of him, surrounded by officers, and said we're going to talk about this in the car. I don't question that it's not reasonable for the police officer to have drawn their weapons on the facts that they had in order to handcuff him into frisking. But that said, those facts still remain relevant to the question of the reasonableness of the I think looking at the totality of the circumstances and what happened. So when Mr. Ortiz pulls up into the gas station, he stops his car. The agents come in on either side. It is clear from the record and the agent's testimony that he could have pulled forward. He was not boxed in. So, yes, they were behind and on side, but he could have moved forward. Another fact in the process of this, they drew their weapons, told him to shut off the car and get out of the car. He came out. Once the agent saw that he had nothing in his hands and was not a threat, he holstered his weapon before he even approached Mr. Ortiz. They met at some point between the cars, and they started talking. Very quickly after he started talking and the agent said, I'm investigating your purchase of these two weapons. He said, I purchased them for someone else. There was no need. It was not at that point. He was not in custody. Who did they? I thought they were. They did. They did give him around a warning. No, he was never Miranda eyes. His associate, his associate was Miranda eyes at some point by another agent. There's minimal testimony on that as to why, other than he appeared agitated, but agent Milligan, who testified at the motion to suppress was quite frankly, not involved in the interactions with his, with Mr. Ortiz's associate. How much time lapsed in this questioning? No Miranda warning and he's free to go. How much, how long did this, this questioning continue? So the agent testified that he had his, his weapon unholstered for minutes. He testified that the time between when he presumably exited the vehicle and, and, and pulled his weapon to the time that the initial statement was made was five to 10 minutes. The, the judge and his findings of facts that it was 20 minutes from the time that the agent pulled up and ordered Mr. Ortiz out of the car to the point where he actually signed the statement. And Mr. Milligan testified that they were in the vehicle for about a half hour, give or take 10 minutes on either side. So a generous reading from all of that would say from the time that they, the agent, agent Milligan pulled into the gas station to the point where Mr. Ortiz signed on the statement was about 40 minutes. It was about 40 minutes. That's the generous reading. The judge here finding because the estimates were rather broad found that it was 20 minutes. Yeah, go ahead. I'm a lot more concerned about what happened in the car. So your assertion that a reasonable person would have felt free to leave with, however you say six agents, let's say there were four outside, two in the car. So he'd been handcuffed. He's sitting in the car. He says he didn't have his keys. Maybe that's arguable whether or not he had his keys and, and, and you maintain, even though apparently you didn't talk about this now in the break, your brief, you focused on this whole, the first statement. And I'm a lot more concerned about the second one in the car, but go ahead. So after the, after agent Milligan and Mr. Ortiz are discussing Mr. Ortiz states that he made, he purchased these on behalf of someone else. Agent Smith comes over and asks if he was Pat Frist. Major Milligan says no. And they handcuff him, Pat Frist Kim. When that's over, they unhandcuff him. They're talking. It's hot. It's July. They go into the car. Only two agents. They're still at the gas station. They have the windows rolled up. The air conditioning is on. They're in public view. Mr. Ortiz is sitting in the front with an agent. He's discussing what happened. Agent Milligan is in the back. He's writing it down. When presumably the interview is over, they get out. Mr. Ortiz asked if he could smoke and they say yes, just not by the gas station, which is reasonable. He wanders away a bit at that point. The agents aren't even really focused on him. Agent Milligan says he took photographs after the interview and everything is done. He has no idea where Mr. Ortiz is. They do go and they eat lunch together. Mr. Ortiz is not arrested. At this point, yes, I believe he is a reasonable person and his position would feel that he could terminate the interrogation or the questioning at any point. Pardon me. It wasn't interrogation, but the conversation as to what exactly occurred at any point, he could have gotten out of the car. Aren't there a lot of similarities between the situation here and the Kavazos case, which you cited in your brief? The Kavazos case, which is the one where they were taken to the secondary. No, this was a case about a questioning at a house and the man was handcuffed and then unhandcuffed. Mr. Kretzer doesn't cite or rely on Kavazos, but since you cited it in your brief, I thought maybe you'd be familiar with the fact. It seems to me there are a lot of similarities between the two, even though Kavazos was at a house rather than in a car. I apologize, Your Honor. I was not the author of the brief and while I briefly reviewed all of the cases there, the specific facts of that are not apparent to me at the moment. They brought a whole lot of officers to the point in that whole transaction. Then what happens is they examine him and talk to him, but what they really are after are the people who they think is the straw purchase. These are very powerful weapons and they do not want them to get out of control. The weapons are now in the vehicle driven by the suspect. So they let him go and they follow him, thinking he's going to take them to the money that's behind this, which is where they're trying to go. But then somebody decides up the line, don't for good reasons for other things that have happened to him, but guns getting away from him. That's a real fact. They said don't let those guns get away. So then at that point go after him and stop him. Is that what happened or not? Is that what happened in this case? Yes. Does the record show that the decision was made, get the weapons at that point? Well, yes, because what happens is they assume that he's going to meet whoever he purchased the weapons for and he stops at a public place. At that point they decide that the risk of finding out who he's going to either get the money from or turn the weapons over to. They punted on trying to find the operator behind the scene, the money man, and decided that they were going to opt for taking the weapons. Yes, correct. But they did investigate further and it did lead them to a third party who admitted that he was going to, that he used Mr. Ortiz to purchase the weapons. So they did eventually find the third party behind it. Anything else? If there are no further questions, I'll rest on my brief. Thank you. Mr. Lurie. Mr. Kretzer, you saved time for rebuttal. I did, Your Honor. Of course, I'm sure the prosecutor knows that whatever information they ultimately got from Mr. Perez-Navarro has no valence on a motion to suppress. The stop was either objectively reasonable or it was not. I think I heard the prosecutor say, Your Honor, at the very beginning that Mr. Ortiz was free to go from the beginning because he could have driven his car forward as he stopped at a gas pump with two cars with two men from either side who approached with their weapons drawn. I guess you could drive forward if you want to get shot in the back of the head as you're driving away. I mean, this, Your Honor, let me be clear, Judge Grace, perhaps I was not clear in my opening about the issue of the keys. On page 13 and 14 and 15 of my brief, I go through this in a lot of detail. From the very beginning, there's no doubt, Agent Milligan was the one who necessarily had to originally take the keys. How do I know? Because his testimony, I approached Mr. Ortiz, direct quote, I told him to kill the ignition. We know that it was Milligan who originally took those keys from Mr. Ortiz, and yet the court keyed in on this issue at the very beginning of the agent's direct examination. Question, who had the keys to the blazer during this period of time? Well, Mr. Ortiz, of course, in the agent's car. Answer, I do not recall, sir. Well, he always says he doesn't recall. But you get down a little bit later, and I quote all this on page 13, there was no doubt that the agent kept the keys or one of the other agents kept the keys because Agent Milligan had to get them back when he, at the end of the questioning, wanted to take this picture that I reproduced twice in the brief, one here on page 14. And to make it clear, superimposed on here, you can see Agent Milligan's reflection here and Mr. Ortiz's car keys here. And that's because this is a hatchback blazer. You can only open it with the keys at the back. So we know necessarily, Judge Graves, as a matter of logic and fact, that not only did Agent Milligan take the keys, maybe Agent Milligan gave them to some other agent to hold in the meantime, but the question Judge Smith asked me, why couldn't Mr. Ortiz leave? Why wouldn't he feel free to leave? Because he physically could not. They had his keys. We know they had his keys, at least until the point in time when they opened it to take this picture after the end of his questioning. Professor LaFave, and I think I quoted a lot of these cases in my brief. I wouldn't agree with Ms. Cullery's representation of the record that there were at no time, were there more than two agents dealing with Mr. Ortiz? Well, I wouldn't agree with that. There were two agents at least, the only agent by Asteros and Milligan in the car themselves. But, of course, Judge Smith, I don't think we can say there were only two agents dealing with him. If for nothing else, we know that it was Agent Smith who came up after Milligan's initial questioning. He's the one who cuffed him and frisked him, so it was a third agent. And then he had a fourth. She mentioned a third agent, but said there were no more than two at any given time. That was her representation of the record. I don't have any reason to disagree with that, although there was a lot of testimony that other agents were coming and saying things to Milligan while they were in the car. I can agree that, and I'm happy to search the transcript and file a supplemental on it, I'm sure there were only, at any given point, physically in the car at those two agents. There may have been other agents who popped their head in from time to time. But, Judge Smith, even if that were the case, there's no doubt there's a phalanx of all these other . . . Judge Smith, the concluding part of my cross of Agent Milligan is almost humorous. I asked him how many agents and how many different cars were there. He couldn't even keep up with them. After he thought he'd listed all of them, he's like, Oh, no, I forgot. There was this other person, and he came. He couldn't even keep track of all the different cars that were there. How many were there? There were at least six agents in five different cars and possibly at least one other agent who necessarily had to come in another car as this went out. We know this, Your Honor. I placed also in my brief a copy of the picture after they'd already hemmed in Mr. Ortiz's car and taken him. We know this because Agent Milligan took the picture of it. There were two other agents standing directly behind that blazer, neither one of whom are Agent Pham and Milligan. And Milligan even admitted that. That's just not my representation of what he looks like. That's in his examination as well. One's looking at his iPhone. One's got his hand to his chin. Your Honors, we would submit that perhaps it's an issue of first impression, but there's a lot of cases where it's been held to be custodial where the police officers took someone's driver's license. I guess there one physically could leave. Just what would you do? You'd be driving without a license. The police would put you in the position of committing some other crime. Judge Graves, it seems fairly tautological to me. You cannot leave in a car when the agents have your keys. That's not why would a reasonable person think they couldn't leave. That's because he physically could not leave. Even after maybe they gave him the keys back, but then they forced him to sit and eat at the restaurant while they took his friend and travel companion, Mr. Diaz, to see Mr. Navarro. Was he supposed to leave his friend stranded there? Well, no, that guy, of course, had been Mirandized, so we already know it was a custodial interrogation as to him. Judge Graves, there is no doubt when your keys are taken, in my supplemental 28J I filed yesterday, I know my time is rapidly dwindling, I point out Professor Lefebvre does point out a handful of cases. Your time has expired now. Okay. Your case is under submission, and we notice your court appointed. I appreciate your willingness to take this and many other appointments. Always glad to be of service. Thank you.